### In re LONGFELLOW PROPERTIES, INC., Debtor.

### Bankruptcy No. 90–10671.

United States Bankruptcy Court, D. New Hampshire.

Dec. 14, 1992.

Nunc Pro Tunc Oct. 13, 1992.

Bruce A. Harwood, Sheehan, Phinney, Bass & Green, Manchester, NH, for the Creditor's Committee.

David A. Sears, Peabody & Brown, Manchester, NH, for James Carner.

Geraldine B. Karonis, Asst. U.S. Trustee, Manchester, NH, for Franklin Childress.

Charles R. Dougherty, Hill & Barlow, P.C., Boston, MA, for Longfellow Properties.

Connie Rakowsky, Orr & Reno, Concord, NH, for Ed Sullivan.

M. Elaine Beauchesne, Sanders & McDermott, Hampton, NH, for Owena T. Drake.

### MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This is in Longfellow Properties on a final hearing on confirmation of the plan. This matter was continued from October 2, 1992 to October 9, 1992 to complete the evidentiary record with regard to feasibility question raised by objection by Carner and Parkhurst, the secured creditors on the subject property that would be developed to not only pay off the mortgages but produce a substantial dividend to general creditors if the project is completed as projected. The Court entered its Order of October 13, 1992 denying confirmation of the plan based upon a bench ruling at the conclusion of the hearing. This Memorandum Opinion sets forth in formal fashion that ruling.

The debtor under this plan of reorganization will retain some $300,000 in unencumbered assets and is in effect using $325,000 in cash coming from an IRS refund that would otherwise be used in a distribution in the estate. The general unsecured creditors total a sizable amount of $8,300,000 and they obviously are interested in a workout on this project which will give them a much higher return presumably

than a relatively small amount of assets that would be liquidated.

The issue, however, is whether the plan can be confirmed over the objection of the secured creditors involved in this project, who would be restricted to a payout on their mortgage over a period of five years at eight percent interest rate under the plan, as opposed to their being able to seek to liquidate the property now to pay off their debt.

The debtor has come before the court on what the witness has testified to as "a conceptual plan" to develop single family residences on some 80 lots on the 230 acres of the property involved. The property involves some considerable wetland and is referred generally as the "Great Bog" in the Portsmouth area. That Great Bog apparently totals 500 acres and this is approximately half of it.

The Great Bog, depending on your view of bogs, may be considered negative or positive, but it is apparent from the record that this is one of the last areas in which new single family residences can be built in the Portsmouth area.

Accordingly, it is important to know what kind of family residences can be built there and what the expertise and skills of the debtor are to assure that the project as proposed will in fact be built out and therefore can support a finding of feasibility in the sense that it is more likely than not on this evidentiary record that this project will be completed as proposed. This debtor is an individual and has never done a large single family real estate development project. He has done commercial projects of other kinds. He has not done a project of this nature in New Hampshire, or anywhere for that matter.

Under his conceptual plan for this project he would construct houses of four bedrooms, 2½ baths in approximately 2,000 square feet with the market price target of $150,000 to $175,000 in sales which with the 80–lot projection would on the projections cover the costs of completion, assuming that those costs are in fact what would be incurred.

The debtor's original plan and original disclosure statement indicated that the project would be for "entry level homes starting at $130,000." As is apparent from this record the plan before the court has been a "moving target" of sorts in which both the price level has fluctuated or changed and the cost figures have changed. This has given the objecting creditors some difficulty in responding, but I believe with the split hearings they have had adequate time to respond and the Court is in a position to rule on the matter.

There has been a great deal of discussion in the testimony about a planned unit development option (referred to generally as a "PUD" in these hearings) under the local zoning ordinance. The only weight I can give to that is there is some alternative under that zoning ordinance that might cover some problems if this project cannot be completed as projected. It does not by itself support anything directly other than to answer the question about some flexibility to cover unforeseen events. The evidentiary record indicates that the planning board is not bound to grant such PUD status but can consider it if it considers the quid pro quo sufficient, i.e., what the public gets from the developer to allow differing types of roads and cluster development or different setbacks that wouldn't be available under the subdivision ordinance.

On that point, my view is that the PUD is a factor only in covering uncertainties in the future, by indicating there would be an option to vary the project in the future if necessary but that the PUD device has no particular weight if the basic record does not show that the project as conceived is feasible.

One important factor in this case is whether the debtor would in fact be motivated and compelled to devote his talents, assuming he has the talents to develop this kind of project, to completion. Under this plan he receives substantial assets that he can retain plus a property in Manchester, New Hampshire and perhaps others that are highly mortgaged but he might be able to develop. But, it has to be noted that he lives on Cape Cod and under the contract that he would be obligated under he would not be required to do this project as a full-time activity but he would only promise his "non-exclusive services." The debtor has

never done a project of any kind in New Hampshire to completion and, as I indicated earlier, he has never done any single family substantial housing project of any nature involving 80 houses.

The record in this case establishes to some extent, and I can take judicial notice of this, because I hear this daily or weekly at least, that the New England real estate market has been in decline in recent years and that there are considerable uncertainties as to which way that market is going to go in the future. The debtor himself conceded that there were no bank loans available for real estate development projects currently but he believes that sales are picking up. It is a fact that currently at least it is very difficult to get any kind of construction funding in this state if it turns out that projections are not realizable. Therefore, whereas the court in many of these cases used to have the comfort of available construction financing to cover unforeseen circumstances, in this case the projections are all, and the price level is all, and the cost projections are all. They have to be substantially supported to support a finding of feasibility not buttressed by the fallback of construction financing.

Another important factor I have to take into account in this case, in considering what weight to give the debtor's testimony and the other evidence presented by the debtor, is that we are in the second year of this case and aside from this conceptual plan the debtor has done very little to get a concrete project before the parties and the Court. The original disclosure statement indicated that his subdivision approvals were to have been filed by October 2, 1992. That has not been done. There is no preliminary subdivision plan and there have been no negotiations (what I would call negotiations) with the appropriate planning and city officials by the debtor with regard to even this conceptual plan.

There was considerable discussion at the hearing about phasing or not phasing this project. The fact is that the original disclosure statement did not indicate phasing. My view is that it would be likely, from what I have in this record, that the city officials and the planning board would probably authorize phasing provided that the plan was carefully prepared and that the phases were well defined so that there were not literally roads going out to nowhere etc., that would leave the remaining areas in a situation that would leave the city unhappy. So, I believe that if this project goes forward the debtor could do phasing, and to the extent that that supports a ruling that self-financing can be projected by phases I think the debtor has shown that. As I indicated, however, that by itself I don't think is relevant to whether cramdown of the secured lender can or cannot be shown. I think it is only relevant to the costs projections.

In other words, it still must be shown that 80 lots can come out of this project to cover this project. There is testimony that the chairman of the unsecured creditors' committee, who is a real estate developer and perhaps a broker, that he and the committee are in favor of this plan. That by itself is not of any evidentiary significance to me in that it goes without saying that the committee in this case would support developing this project because that is the only way they'll get any substantial dividend and they are in effect risking other people's money, i.e., that of the mortgagee on the property. Without casting any aspersions, I see this often in these proceedings and it is of no evidentiary weight to me really that the committee is in favor of this project per se, in terms of actual findings with regard to costs and price levels and so forth. If evidentiary weight were intended, it may be that that gentleman might be qualified as an expert and could have been called to testify.

With regard to the questions raised by the objectors on soil conditions and wetlands, I think the debtor has effectively refuted those contentions. I think there is sufficient dry land in the area and the soil condition is sufficient and is not inappropriate for residential construction. I think they would probably be able to get the culvert permit or bridge, I called it a bridge, permit to join the front and back portions, joining the two dry areas. The ultimate question though is still whether they have shown that 80 lots can come out of dry land and the joined areas assuming the culvert can be obtained.

With regard to whether the debtor would have to obtain complete $1.3 million performance bonds for the project I believe the debtor has shown or the evidence shows that it is more likely than not that they could get phased bonds, again provided that the phases were well defined so that the city would buy that approach with a clear showing that they wouldn't be left with something beyond what the current bonding would complete that would be undesirable from the city's standpoint.

There is some evidence in this record that the planning board is desirous of seeing some economic activity in building in that city and that prior years when they were fearful of over building in the roaring 80s has somewhat dissipated. If this project goes forward the evidence indicates that at least 73 of the 80 lots would require road building. The evidence also establishes that there are high tension power lines going through the project in several locations and that there is a PSNH substation at the outside corner of the project. It is visible to a number of the lots.

The property does contain a considerable amount of wetlands which under current regulations and litigation is a somewhat debatable concept. What some people consider wetlands apparently is not what other people consider wetlands but regulators may consider wetlands and accordingly, this project does have some uncertainty as to just how the wetland areas could be handled.

The preponderance of the evidence in this record I will find, considering the testimony and the contrary testimony, that the highest and best use for this property is for residential single family homes, but that the relevant market is for starter homes or entry level homes in the debtor's original disclosure statement in the range of $115,000 to $140,000. I believe the testimony to that effect is more persuasive than the contrary testimony—taking into account all aspects of both. I also base that conclusion upon the record in terms of comparable areas and it would appear to me that this area is not equally comparable in price level to the Woodlands area referred to by one of the witnesses. A commercial zone surrounds this area. At least one side of it involves manufacturing enterprises etc. that would be more of a negative than the commercial area surrounding the Woodlands area.

The record also establishes that this area is much closer to the Pease Air Base runways. A portion of this parcel is within one mile of the major runway. I believe the debtor's evidence does establish that this portion could be built upon, with a height restriction that wouldn't restrict this type of construction, but obviously even if you can build there you have to put triple glazing on your windows and that tells anybody that it's a little noisy out there, or can be, and I think therefore the comparability that one witness relied on is not really appropriate.

On the "burial ground problem" I find that that is no significant factor one way or another with regard to this project.

That brings me to the final conclusion as to whether the debtor has shown that this plan is feasible, within the meaning of § 1129(a)(11) of the Bankruptcy Code, i.e., that it is more likely than not that the project in question will be completed; that the secured creditor will be paid out in full over the time period indicated; and that the general creditors will get what they are promised under the plan. I will conclude that the debtor has failed to show that it is more likely than not that this plan can be performed.

This record in my judgment falls far short of what a plan that seeks to leave a debtor with substantial assets and leave to the creditors a parcel of land that needs to be developed would have to show to show feasibility. I do agree with Mr. Rust that no developer would spend all the money up front to do all the engineering and all the studies necessary to get final approvals and final permits, but this "conceptual plan" even aside from its moving target aspect in my judgment is not sufficient to support a feasibility finding.

I cannot find that it is more likely than not on this record that this developer will get 80 lots out of that project. I do find that the projected $150,000 to $175,000 relevant market target range is not realistic

and that the relevant market is priced at an entry level as I have indicated under the objecting creditors' witnesses' testimony.

I have to take into account the fact this debtor is not in the area, is not conducting single family projects, and in fact has not conducted any or completed any substantial single family housing projects of this nature or scope. I have to take into account the market uncertainty as to the market generally in the present times. While that is not dispositive and does not require a finding of nonfeasibility by itself, it is a factor I have to take into account.

For all these reasons the Court will conclude that the objectors have sustained the objection that the debtor has failed to show that the plan is feasible pursuant to the provisions of § 1129(a)(11) of the Bankruptcy Code and therefore the plan cannot be confirmed. That renders moot the other issues here. The Court has entered a formal order to this effect separately.

There will also be a separate order setting the case for hearing on an Order to Show Cause as to whether the case should be dismissed or converted.